MICHAEL W. BIEN – 096891
LISA ELLS – 243657
JESSICA WINTER – 294237
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:  (415) 433-6830
Facsimile:   (415) 433-7104
Email:       mbien@rbgg.com
             lells@rbgg.com
             jwinter@rbgg.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| CLAUDIA CHAVEZ,<br><br>            Plaintiff,<br><br>     v.<br><br>LAC+USC MEDICAL CENTER, THE LOS ANGELES COUNTY DEPARTMENT OF HEALTH SERVICES and THE COUNTY OF LOS ANGELES,<br><br>            Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §§ 12101, *et seq.*, SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794, *et seq.*, SECTION 1557 OF THE AFFORDABLE CARE ACT, 42 U.S.C. § 18116, *et seq.*, AND CALIFORNIA GOVERNMENT CODE §§ 11135, *et seq.*<br><br>DEMAND FOR JURY TRIAL** |

1    Plaintiff CLAUDIA CHAVEZ, by and through counsel, brings this Complaint

2    against Defendants LAC+USC MEDICAL CENTER, LOS ANGELES COUNTY

3    DEPARTMENT OF HEALTH SERVICES, and THE COUNTY OF LOS

4    ANGELES:

5                              **INTRODUCTION**

6         1.    This action seeks to remedy the discrimination that Plaintiff Claudia

7    Chavez ("Plaintiff" or "Ms. Chavez"), who is deaf, faced during a three-day

8    hospitalization at LAC+USC Medical Center, and to prevent similarly situated

9    individuals from being forced to undergo the same ordeal.  Ms. Chavez arrived at

10   LAC+USC Medical Center in severe pain and underwent surgery to remove her

11   gallbladder.  However, Ms. Chavez never knew her diagnosis, what surgery she

12   underwent, or anything about her post-operative needs due to Defendants' failure to

13   provide a qualified sign language interpreter to ensure effective communication.

14   Rather than provide an interpreter, hospital personnel largely ignored Ms. Chavez

15   and addressed Ms. Chavez's mother instead.  As a consequence of LAC+USC

16   Medical Center's discriminatory conduct, Ms. Chavez did not learn that her

17   gallbladder had been removed until nearly two weeks after the surgery.  She has

18   suffered recurring nightmares and sought therapy as a result of this ordeal.  She has

19   also returned to LAC+USC Medical Center on multiple occasions since her initial

20   hospitalization and faced the same discriminatory conduct.

21        2.    The California Department of Public Health has already found that

22   LAC+USC Medical Center's conduct violated California state laws regarding

23   Patients' Rights, including 22 C.C.R. §§ 70707(b)(4) & (5).

24        3.    Defendant LAC+USC Medical Center, which on information and belief

25   is owned and operated by Defendant Los Angeles County Department of Health

26   Services and by Defendant Los Angeles County, has violated Ms. Chavez's rights

27   under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131 *et*

28   *seq.*, Section 1557 of the Patient Protection and Affordable Care Act (ACA), 42

[3453717.11]

U.S.C. §§ 18116 *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.*, California Government Code § 11135, and the regulations implementing each. Further, Ms. Chavez faces an actual and imminent risk of the same or similar rights violation.

4.     Plaintiff seeks declaratory and injunctive relief, compensatory damages, and attorneys' fees.

## JURISDICTION

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiff's claims arising under Title II of the ADA, 42 U.S.C. §§ 12131, *et seq.*, Section 1557 of the ACA, 42 U.S.C. § 18116, *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq.*, and regulations promulgated thereunder.

6.     This court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's pendent claim under Cal. Gov. Code § 11135 and regulations promulgated thereunder.

## VENUE

7.     Venue is proper in the Central District of California pursuant to 28 U.S.C. §§ 1391(b)-(c), as (i) Defendants are located within the District and (ii) the acts and omissions giving rise to this claim occurred within the District.

## PARTIES

8.     Plaintiff Claudia Chavez is deaf.  She is substantially limited in the major life activities of hearing and speaking.  Her primarily means of communication is American Sign Language.  She requires a qualified sign language interpreter for effective communication in medical settings.  At all times relevant to this Complaint, she was approximately 25 years old.

9.     Defendant LAC+USC Medical Center ("Defendant Hospital") is a 600-bed public teaching hospital located in Los Angeles, California that offers primary and specialty services in both outpatient and inpatient settings.  On its official public

[3453717.11]

website, Defendant Hospital bills itself as "a world-class teaching hospital, Level-One trauma center, and hub in the County-run healthcare system serving 10 million residents."[1]  On the same website, Defendant Hospital also touts itself as "a training site for the U.S. Navy and more than 900 physicians completing their Graduate Medical Education in nearly every medical specialty and subspecialty."  On information and belief, many of the doctors and nurses who work at Defendant Hospital are considered Los Angeles County employees within its Department of Health Services.

10.  According to its official public website, Defendant Los Angeles County Department of Health Services ("DHS") is "an integrated system of providers, clinics, and hospitals," within Los Angeles County.[2]  On the same website, Defendant DHS lists Defendant LAC+USC Medical Center under its "Locations that provide Inpatient Services."[3]  On information and belief, many of the doctors and nurses who work at Defendant Hospital are considered Los Angeles County employees within its Department of Health Services.

11.  On information and belief, Defendant Los Angeles County owns and

---

[1] *See* LAC+USC Medical Center, "About Us," available at http://dhs.lacounty.gov/wps/portal/dhs/!ut/p/b1/04_SjzQ0NrcwNLQ0MjTRj9CPykssy0xPLMnMz0vMAfGjzOLdDAwM3P2dgo3cLSwMDBwNXHzcPPxdjdxdjYAKIpEVWJj6OQEVmJj6W3iYGDqbGhDSH64fhaoE3QRTQgoMoAoMcABHA30_j_zcVP3cqBxLzywTRQDKULqp/dl4/d5/L2dJQSEvUUt3QS80SmtFL1o2X0YwMDBHT0JTMkc4ODAwQTBETEZZIT0UyS0g1/ (last visited Dec. 18, 2019).

[2] *See* Health Services Los Angeles County, "Home," available at http://dhs.lacounty.gov/wps/portal/dhs/!ut/p/b1/04_SjzQ0NTS1NDQ3srTQj9CPykssy0xPLMnMz0vMAfGjzOLdDAwM3P2dgo3cLSwMDBwNXHzcPPxdjTy8jIEKIpEVWJj6OQEVmJj6W3iYGDqbGhDSH64fhaoE3QRTQgoMoAoMcABHA30_j_zcVP3cqBxLzywTRQBL_PNh/dl4/d5/L2dJQSEvUUt3QS80SmtFL1o2X0YwMDBHT0JTMjg1TkIwQTA0NU84SDQxQzU1/ (last visited Dec. 18, 2019).

[3] *See* Health Services Los Angeles County, "Inpatient Services," available at http://dhs.lacounty.gov/wps/portal/dhs/services/inpatient/ (last visited Dec. 18, 2019).

[3453717.11]

operates LAC+USC Medical Center, and employs many of the nurses and doctors who work there. Defendant Hospital is listed on Los Angeles County's website. Defendant Hospital describes itself as a "hub in the County-run healthcare system."[4] And at least some of the openings for nurses and doctors at LAC+USC Medical Center are posted through the Los Angeles County jobs website.[5]

12.     On information and belief, some of the doctors involved in Ms. Chavez's visits were employees of the Keck School of Medicine of the University of Southern California, an entity who, through an affiliation with Defendants, provides doctors at LAC+USC Medical Center.

13.     On information and belief, some of the nurses involved in Ms. Chavez's visits were employees of the Los Angeles County College of Nursing and Allied Health, an entity who, through an affiliation with Defendants, provides nurses at LAC+USC Medical Center.

14.     On information and belief, all doctors, nurses and medical support staff involved in Ms. Chavez's visits to LAC+USC Medical Center are employees of Defendants or provide healthcare services at LAC+USC Medical Center by virtue of their employer's affiliation with Defendants.

## STATEMENT OF FACTS

15.     Ms. Chavez visited Defendant Hospital four times between December 31, 2016, and December 16, 2017. During all but one of these visits, Defendants' personnel either relied on Ms. Chavez's mother, Claudia Farias

---

[4] *See* LAC+USC Medical Center, "About Us," available at http://dhs.lacounty.gov/wps/portal/dhs/!ut/p/b1/04_SjzQ0NrcwNLQ0MjTRj9CPyks sy0xPLMnMz0vMAfGjzOLdDAwM3P2dgo3cLSwMDBwNXHzcPPxdjdxdjYAKI pEVWJj6OQEVmJj6W3iYGDqbGhDSH64fhaoE3QRTQgoMoAoMcABHA30_j_z cVP3cqBxLzywTRQDKULqp/dl4/d5/L2dJQSEvUUt3QS80SmtFL1o2X0YwMDB HT0JTMkc4ODAwQTBETEZIT0UyS0g1/ (last visited Dec. 18, 2019).

[5] *See* Los Angeles County, "Job Opportunities," available at https://www.governmentjobs.com/careers/lacounty (last visited Dec. 18, 2019).

("Ms. Farias"), to communicate with Ms. Chavez, or they ignored Ms. Chavez entirely and spoke only to her mother.  The lone exception, a follow-up visit on January 12, 2017, occurred when Ms. Chavez attended the scheduled appointment alone, without her mother.

16.     At all times relevant to this Complaint, Ms. Chavez has been over the age of eighteen and competent to handle her own affairs.  No legitimate, non-discriminatory reason existed for Defendants' personnel not to communicate directly with Ms. Chavez as the patient.

17.     Ms. Chavez has filed a complaint with the California Department of Public Health (the Department) regarding the denial of her rights during a single three-day visit lasting December 31, 2016 until January 2, 2017.  The Department's Statement of Deficiencies is attached hereto as **Exhibit A**.

18.     In its Statement of Deficiencies, the Department found that Defendant Hospital's conduct during this visit violated numerous California state laws regarding patients' rights, including 22 C.C.R. §§ 70707(b)(4) & (5).  *See* **Exhibit A** at 1-2.

19.     The Department found Defendant Hospital violated numerous laws, despite having policies and procedures that prohibited the conduct set forth below and that promised patients interpreting services with a goal of "provid[ing] interpreter services in 15 minutes or less," *see id.* at 4, and required Defendant Hospital to take remedial steps, *see id.* at 1-3.

### Hospitalization, December 31, 2016 to January 2, 2017

20.     On or about December 31, 2016, Ms. Chavez began to experience excruciating pain in her abdomen.  She went to Defendant Hospital, accompanied by her mother, Ms. Farias.  Ms. Chavez arrived at Defendant Hospital in the early afternoon.

21.     Upon arrival, Ms. Chavez requested a qualified sign language interpreter by gesturing this request to her mother, who conveyed it to medical staff.

[3453717.11]

22.     According to the Department, at the time of Ms. Chavez's visit, Defendant Hospital had policies and procedures that provided for both video-based and in-person interpreting services with a goal "to provide interpreting services in 15 minutes or less." *See* **Exhibit A** at 4.

23.     On information and belief, Defendants could have used these video-based or in-person interpreting services to provide interpreting services for Ms. Chavez.

24.     Instead, Defendants' employee stated that Defendant Hospital did not have the ability to summon a qualified sign language interpreter at that time.

25.     For the entirety of the three-day visit, Ms. Chavez was forced to rely almost entirely on her mother, Ms. Farias, for all communication with doctors and nurses.

26.     According to the Department, at the time of Ms. Chavez's visit, the Hospital's policies and procedures prohibited reliance on family and friends as interpreters "unless expressly requested by the family/surrogate or in an emergency" and required hospital personnel to "document in the patient's health/medical record: (1) the reason for using a non-medical center staff member as an interpreter and (2) the express written permission of the patient/surrogate." *See* **Exhibit A** at 3.

27.     In violation of this policy, Defendants' personnel did not record why they ignored the wishes of their patient, Ms. Chavez, and instead forced her to rely on Ms. Farias for all communication with medical staff and personnel.

28.     Moreover, Ms. Farias does not know sign language.  She and her daughter, Ms. Chavez, communicate solely through a gestural system of their own invention and are able to convey only rudimentary information to one another. Ms. Farias has no ability to convey complex medical information to her daughter through sign language.

29.     The Department corroborated Ms. Chavez's account through its review of her medical records.  *See* **Exhibit A** at 1-4.  This review revealed a number of

[3453717.11]

instances where Ms. Chavez's medical records documented that a "family member at bedside interpreted for staff as needed." *See id* at 4. This review also revealed instances where the medical records stated that Ms. Chavez's "preferred mode of communication was sign language," but "the area for interpreter/translator needed was documented as 'no'." *See id.*

30. Based on this review, the Department found that Defendant Hospital personnel "did not assess a need of interpretation services for" Ms. Chavez, violating Defendant Hospital's obligations under 22 C.C.R. § 70707(b)(5), and "creat[ing] the risk of violating [Ms. Chavez's] rights." *See id.*

31. During her initial hours at the hospital on December 31, a nurse administered IV medication to Ms. Chavez to help her manage her pain. The nurse did not effectively convey to Ms. Chavez the name of the medication or anything about it, beyond the fact that it was intended for pain.

32. When Ms. Chavez attempted to request a third administration of the medication, she learned from Ms. Farias that the medication was morphine and that Ms. Farias had concerns about what would happen if Ms. Chavez took too much.

33. Due to the absence of an interpreter, Ms. Chavez had no opportunity to discuss with the nurse her concerns about the medication the nurse was administering. She felt she had no choice but to heed her mother's advice, stop taking pain medication, and endure excruciating pain. On information and belief, with effective communication, Ms. Chavez could have learned of the hospital's protocols to prevent morphine overdose or addiction, or could have learned of alternative pain medications, and she would not have had to suffer in such pain.

34. During her initial hours at the hospital on December 31, Ms. Chavez also underwent both an ultrasound and an MRI.

35. Ms. Chavez did not know in advance what these procedures were and never learned what they uncovered about her health. She was vaguely aware that hospital personnel were trying to ascertain the correct diagnosis, but she did not

know what it was.

36.     During this time, many doctors and nurses entered and exited Ms. Chavez's room.  She never knew their names or their roles.  She could only guess, based on their clothing.

37.     These doctors and nurses made no attempt to address Ms. Chavez directly.  Rather, they spoke to her mother, Ms. Farias.

38.     As a consequence, Ms. Farias—but not Defendants' patient, Ms. Chavez—knew who the individuals entering and exiting Ms. Chavez's room were, and also knew that the tests being run on Ms. Chavez were seeking to determine whether Ms. Chavez had stones in her gallbladder or in her bile duct.

39.     At some point, a male nurse attempted to address Ms. Chavez directly.  On information and belief, he did so because he did not see Ms. Farias.

40.     Ms. Chavez indicated to the nurse that she is deaf.

41.     The nurse responded by bringing in equipment that provides video-based interpreting services, as described in Defendant Hospital's policy.  The nurse was unable to connect to an interpreter quickly, however, and chose to discontinue use of the equipment.

42.     Rather than call for a qualified sign language interpreter to come on site, the interpreter wrote a note to Ms. Chavez that read "you have gallstone cholecystitis."

43.     Ms. Chavez did not understand this note.  She did not understand either the words "gallstone" or "cholecystitis."

44.     The nurse gave Ms. Chavez no opportunity to ask questions, however.

45.     On information and belief, shortly after writing this note, the nurse noticed Ms. Farias sitting nearby with a friend.

46.     On information and belief, rather than have a full conversation with Ms. Chavez, the nurse went over to Ms. Farias and Ms. Farias's friend, and shared with them full information about Ms. Chavez's diagnosis and her plan of care.

[3453717.11]

Consequently, Ms. Chavez's mother's friend knew more about Ms. Chavez's diagnosis and plan of care than Ms. Chavez herself.

47.    Thereafter, the nurse left.  He made no effort to have Ms. Farias convey this information to her daughter.  Any effort would have proved fruitless, however, as Ms. Farias does not have the vocabulary necessary to convey to her daughter any medical information in sign language.

48.    During this, or one of the many other interactions with Ms. Farias that occurred during Ms. Chavez's first twelve hours at Defendant Hospital, the doctors and nurses disclosed to Ms. Farias the following: Ms. Chavez had an infection in her gallbladder, caused by gallstones; the doctor intended to do surgery to remove the gallbladder; the surgery would be a laparoscopic procedure, involving four small incisions into her abdomen; the surgery could not be performed immediately due to the gallbladder infection; and that Hospital personnel would administer antibiotics to treat Ms. Chavez's infection and would perform the surgery once the infection had abated.

49.    Ms. Chavez received none of this information.  She spent more than twelve hours at the hospital in considerable pain, but did not know the cause of the delay in treating her illness.  She was able to glean from her mother that she had stones and would be having surgery, but did not know what type of stones or what type of surgery.  She learned nothing directly from Defendants' employees.

50.    Due to Defendants' personnel's failure to make any attempt to convey information to Ms. Chavez, she did not know the purpose of the surgery (to remove her gallbladder) nor did she know the kind of incisions the surgeon would make.

51.    Ms. Chavez had a lot of questions.  She had never undergone surgery before, and was very worried about the procedure.  She wanted to know about her non-surgical options.  She also wanted to know how invasive the surgery would be, for example, how many incisions the surgeon would make and of what size.

52.    Ms. Chavez also had a history of trauma, and wanted to know very

[3453717.11]

1   detailed information about what would happen during the course of the surgery,

2   including who would be in the room and how much of her body would be exposed

3   to these strangers.

4         53.    Due to Defendants' failure to provide a sign language interpreter,

5   Ms. Chavez could not have any of the important conversations she needed to have

6   with her healthcare team.

7         54.    Other than the nurse's four-word written explanation about "gallstone

8   cholecystitis," the only other attempt Defendants' personnel made to communicate

9   with Ms. Chavez came when another nurse showed her a picture of internal organs,

10  pointed to the picture, and again pointed to her.

11        55.    From this interaction, Ms. Chavez understood she was being shown a

12  picture of herself somehow, but she had no further understanding of what the picture

13  was intended to convey.

14        56.    During this time period, Ms. Chavez posted to Facebook about her

15  ordeal.  Several friends visited her in the hospital.  These friends were also deaf,

16  however, and could not update her regarding her condition nor facilitate

17  communication with hospital personnel.

18        57.    In the morning on January 1, 2017, a large group of doctors came into

19  Ms. Chavez's room.  She knew they were doctors only because they were all

20  wearing white coats.

21        58.    One of the doctors handed Ms. Chavez a piece of paper covered in

22  dense writing and a pen.  Ms. Chavez did not understand what the piece of paper

23  was for.

24        59.    Due to Defendants' failure to provide a qualified sign language

25  interpreter, Ms. Chavez was forced to rely on her mother to find out what the paper

26  was for.  From her mother, Ms. Chavez learned only that the paper was for her

27  surgery, and that she needed to sign it because people were waiting.

28        60.    Ms. Chavez could not understand the form due to the dense legal and

[3453717.11]

medical jargon and due to her weakened condition.  She attempted to ask questions, but could not do so because the doctors could not understand her without an interpreter present.  Ms. Chavez signed the form, not knowing what she had consented to.

61.    Ms. Chavez's medical records indicate that "[h]er consent was performed using a written description of the procedure including risks and benefits and drawings to help with understanding. All of her questions were answered via written text or via her mother, who is able to sign."  This is false.

62.    Ms. Chavez has no recollection of receiving a "written description of the procedure" beyond the four words a nurse scrawled onto a paper, which she did not understand.  Ms. Chavez has no recollection of receiving any "drawings to help with understanding" beyond the ambiguous picture a nurse pointed at.  She had no understanding of the risks or benefits of the procedure and none of her questions were answered, at least in part due to the fact that her mother is not able to sign.

63.    Further, based on the (false) statement on Defendant Hospital's consent procedure, the Department found that Defendant Hospital "failed to ensure [Ms. Chavez's] rights were fully respected" due to Defendant Hospital's use of a "family member as an interpreter for sign language as a substitute for hospital provided interpreter services when obtaining informed consent" violated Defendant Hospital's obligations under 22 C.C.R. § 70707(b)(5).  *See* **Exhibit A** at 2.

64.    The Department further found that Defendant Hospital's "failures created the risk of violating [Ms. Chavez's] rights."  *See id.*

65.    Some twenty hours after Ms. Chavez first arrived at the hospital, at approximately 11:00 AM on January 1, 2017, Ms. Chavez finally was wheeled into the operating room.

66.    Due to the absence of a sign language interpreter, Ms. Chavez was given no opportunity to learn in advance who would be in the room or what would occur while she was under general anesthesia.

[3453717.11]

67.     Due to the absence of a sign language interpreter, Ms. Chavez had no ability to request in advance that she be able to see who was in the room before she became incapacitated.  This safety precaution was very important to her due to her history of trauma.

68.     Moments after Ms. Chavez was wheeled into the operating room, an arm appeared out of nowhere and placed a mask over her nose and mouth.  She did not know who the arm belonged to, even to know if it belonged to a man or a woman.  Within seconds, she was asleep.

69.     After Ms. Chavez awoke from surgery several hours later, Defendant Hospital still had not secured a qualified sign language interpreter.

70.     Due to Defendants' failure to secure a qualified sign language interpreter, Ms. Chavez had no opportunity to ask questions following her surgery.

71.     For example, Ms. Chavez noticed that the doctor had made four incisions in her abdomen.  She had assumed there would be just one incision, and wanted to know the reason for each.  She was not able to ask Defendants' personnel this question, because Defendants had not provided a means for them to communicate effectively.

72.     Importantly, Defendants had explained to Ms. Farias how many incisions they would be making into Ms. Chavez's abdomen and the purpose for each.  Ms. Farias explained this information to Ms. Chavez as best she could through their rudimentary gestural system, but Ms. Farias was explaining from memory and was not able to provide Ms. Chavez with full information.

73.     Ms. Chavez felt that one incision in particular caused her significant pain.  However, she was not able to share this information with Defendants' personnel nor ask the reason, due to Defendants' failure to provide a means of effective communication between them.

74.     Ms. Chavez remained in the hospital until January 2, 2017.  Defendants did not provide a qualified sign language interpreter at any point.

[3453717.11]

75.     On January 2, 2017, a nurse presented Ms. Chavez with some kind of breathing apparatus.  Ms. Chavez understood that she was supposed to breathe into the tube, which would register how powerfully she was able to exhale.  Ms. Chavez inferred that she needed to exhale with a certain level of power before she could be discharged, but did not know for certain because Defendants had not provided a means for effective communication between her and Defendants' personnel.

76.     Around the same time, hospital staff served Ms. Chavez lunch. Ms. Chavez believed she needed to eat a substantial portion of her lunch before she could be discharged.

77.     Ms. Chavez was unable to exhale powerfully into the breathing apparatus, nor was she able to eat solid food.  Instead, Ms. Farias ate much of the food that Ms. Chavez had been served.

78.     When the nurse returned, she noticed that Ms. Chavez's food had been eaten and, on information and belief, determined Ms. Chavez to be ready for discharge.

79.     Ms. Chavez disagreed.  However, due to the absence of a sign language interpreter, Ms. Chavez had no opportunity to tell the nurse that her mother had eaten her lunch or to explain how weak she still felt.

80.     Medical records for Ms. Chavez from January 2, 2017, erroneously state that Ms. Chavez's "diet was serially advanced from clears to solid foods." This is false, as Ms. Chavez was not able to consume solid food at the time of her discharge.

81.     Thereafter, Ms. Chavez was sent to another department within Defendant Hospital for an explanation of how to treat the dressing on her surgical wounds.

82.     Defendants failed to provide a qualified sign language interpreter for this interaction.

83.     Instead of communicating with Ms. Chavez, the patient, the wound care

[3453717.11]

1    specialist gave the instructions to Ms. Farias.

2        84.    Ms. Farias did not attempt to relay the instructions to Ms. Chavez until

3    the two had arrived at home.  Even then, Ms. Farias could not convey the full set of

4    instructions given by the wound care specialist due to her limited proficiency in sign

5    language.

6        85.    Ms. Chavez's medical records from the same day also erroneously

7    indicate that "appropriate teaching for dressings done prior to [discharge]" and that

8    "Patient was advised to seek medical attention or call with fever, nausea/vomiting,

9    or intractable pain.  Appropriate teaching and education was performed for the

10   pertinent incision sites."

11       86.    This is false.  Defendants' personnel staff never conveyed any of this

12   information to their patient, Ms. Chavez.  Hospital personnel informed her mother,

13   Ms. Farias, only.

14       87.    Ms. Chavez's medical records from the same day also erroneously

15   indicate medications were "offered but refused."  Ms. Chavez does not recall ever

16   being offered or refusing medications.  She recalls that she or her mother picked up

17   her medications from the pharmacy soon after her discharge.

18       88.    Since her discharge from Defendant Hospital on January 2, 2017,

19   Ms. Chavez has continued to experience significant health problems.  She has had

20   persistent trouble with nausea and vomiting and lost approximately 30 pounds.

21       89.    Ms. Chavez's experience at Defendant Hospital also caused her to

22   experience recurring nightmares.  She is haunted by the image of the disembodied

23   arm that placed the mask over her face just before she underwent surgery.

24       90.    In an effort to sleep despite these recurring nightmares, Ms. Chavez

25   became addicted to cold medicine.

26       91.    Due to the trauma of the lack of effective communication at Defendant

27   Hospital, Ms. Chavez has sought therapy.

28       92.    Ms. Chavez has returned to Defendant Hospital on three occasions

since her January 2, 2017 discharge.  On each of these occasions, whenever Ms. Farias was present, Defendant Hospital personnel ignored her requests for a qualified sign language interpreter and instead communicated exclusively with Ms. Farias.  The lone exception occurred for a pre-schedule appointment that Ms. Chavez attended alone.

**Scheduled Appointment, January 12, 2017**

93.    On January 12, 2017, Ms. Chavez returned to Defendant Hospital for a scheduled surgical follow-up appointment.

94.    Ms. Farias drove Ms. Chavez to the doctor's office; however, Ms. Chavez directed her mother to wait in the waiting room during the appointment.

95.    During the appointment, Ms. Chavez met with the doctor alone.

96.    Ms. Chavez told the doctor she was deaf, and he provided a qualified sign language interpreter via video.

97.    Because Defendant Hospital provided a qualified sign language interpreter for this follow-up appointment two weeks after her discharge from the hospital, Ms. Chavez's doctor was able to tell her what had happened during her surgery.

98.    It was not until this appointment that Ms. Chavez learned that she had been diagnosed with gallstones, that she had had surgery to remove her gallbladder, and that the procedure had been laparoscopic.  It was not until this appointment that she learned the purpose of each of the four incisions Defendant Hospital staff made in her abdomen.

99.    With the provision of a qualified sign language interpreter at this follow-up appointment, some two weeks after her initial hospital stay, Ms. Chavez was finally able to ask questions and get the information that she had had a right to know two weeks before.

**Emergency Department Visit, July 4, 2017**

100.    On July 4, 2017, Ms. Chavez returned to Defendant Hospital due to

[3453717.11]

constipation and sought treatment through the emergency department.  Ms. Farias and Ms. Chavez's roommate accompanied her during this visit.

101.   Ms. Chavez's roommate is also deaf.

102.   Prior to the visit, Ms. Chavez was concerned that the hospital would again deny her the opportunity to participate in her own medical care.  In an effort to ensure an opportunity to participate, she wrote out a note explaining her symptoms and requesting an interpreter.

103.   When the nurse came into Ms. Chavez's hospital room, Ms. Chavez presented the nurse with the note requesting an interpreter.  The nurse said she would return.

104.   When the nurse returned, she did not provide an interpreter.  Rather, she asked Ms. Farias to interpret.

105.   Ms. Farias complied, but she was unable to convey much information to Ms. Chavez because Ms. Farias does not know sign language.

106.   As a result, Ms. Chavez could glean only the basic information her mother was able to convey to her through rudimentary gestures, and was deprived of the opportunity to get full information her own health and the opportunity to ask any additional questions that came to mind.

**Emergency Department Visit, December 16, 2017**

107.   On December 16, 2017, Ms. Chavez returned to Defendant Hospital due to swelling in her arm after receiving a vaccine and sought treatment through the emergency department.  Ms. Farias accompanied her during this visit.

108.   Upon arrival, Ms. Chavez requested a sign language interpreter through her mother.

109.   Hospital personnel refused to obtain a sign language interpreter and instead communicated primarily with Ms. Farias.

110.   What little information Ms. Chavez learned about her own health during this visit, she had to glean from her mother's rudimentary gestures.

[3453717.11]

111.   Since the above incidents, Ms. Chavez has continued to experience gastrointestinal issues, and has sought medical care at hospitals and clinics.

112.   Ms. Chavez would like to return to Defendant Hospital to receive medical care related to her gastrointestinal issues, due to her belief that Defendant Hospital knows her medical history and will provide better care as a result. However, Ms. Chavez has been deterred from returning to Defendant Hospital due to their repeated failure to provide interpreting services.

**FIRST CLAIM FOR RELIEF**
**Violation of Title II of the ADA, 42 U.S.C. §§ 12131 *et seq.*
(Against All Defendants)**

113.   Plaintiff incorporates by this reference all preceding paragraphs as though fully set forth herein.

114.   Pursuant to 42 U.S.C. § 12132(a), "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

115.   A "public entity" includes state and local governments, their agencies, and their instrumentalities.  42 U.S.C. § 12131(1); 28 C.F.R. § 35.104.

116.   As a county-run hospital, Defendant LAC+USC Medical Center is an instrumentality of a local government and a public entity within the meaning of Title II of the ADA.  *See* 42 U.S.C. § 12131; 28 C.F.R. § 35.104.

117.   As a department of a county, Defendant DHS is a department of a local government and a public entity within the meaning of Title II of the ADA.  *See* 42 U.S.C. § 12131.

118.   As a county, Defendant County of Los Angeles is a local government and a public entity within the meaning of Title II of the ADA.  *See* 42 U.S.C. § 12131; 28 C.F.R. § 35.104.

119.   The term "disability" includes physical impairments that substantially limit one or more major life activities.  42 U.S.C. § 12102; 28 C.F.R. § 35.108.  At

[3453717.11]

all times relevant to this complaint, and currently, Plaintiff has been deaf and substantially limited in the major activities of hearing and speaking.  Plaintiff Chavez is thus a qualified individual with a disability within the meaning of Title II of the ADA. 42 U.S.C. §§ 12102, 12131; 28 C.F.R. § 35.108.

120.   Plaintiff Claudia Chavez is substantially limited in the major life activities of hearing and speaking.  She is a qualified individual with a disability within the meaning of Title II of the ADA. 42 U.S.C. §§ 12102, 12131; 28 C.F.R. § 35.108.

121.   The regulations implementing Title II of the ADA require that, "[a] public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1).

122.   Further, "[a] public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." *Id.* § 35.160(b)(1).

123.   Auxiliary aids and services include "qualified interpreters." 42 U.S.C. § 12103(1)(A); 28 C.F.R. § 35.104.

124.   "In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities." 28 C.F.R. § 35.160(b)(2).  "Primary consideration" means that "[t]he public entity shall honor the choice [of the individual with a disability] unless it can demonstrate that another effective means of communication exists or that use of the means chosen would not be required under § 35.164. Deference to the request of the individual with a disability is desirable because of the range of disabilities, the variety of auxiliary aids and services, and different circumstances requiring effective communication." 28 CFR part 35, app. A.

[3453717.11]

125.   "In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability."  28 C.F.R. § 35.160(b)(2).

126.   To this end, "[a] public entity shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication except – (i) In an emergency involving an imminent threat to the safety or welfare of an individual or the public where there is no interpreter available; or (ii) Where the individual with a disability specifically requests that the accompanying adult interpret or facilitate communication, the accompanying adult agrees to provide such assistance, and reliance on that adult for such assistance is appropriate under the circumstances."  28 C.F.R. § 35.160(c)(2).

127.   When providing any aid, benefit, or service, a public entity shall not aid or perpetuate, through contractual, licensing, or other arrangements, discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's programs. 28 C.F.R. § 35.130(b)(1)(v).

128.   In addition, a public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability.  28 C.F.R. § 35.130(b)(3)(i).

129.   Defendants intentionally violated Title II by deliberately relying on the adult accompanying Ms. Chavez—her mother—to interpret or facilitate communication when there was no imminent threat to Ms. Chavez's safety or welfare, and Ms. Chavez did not request this arrangement.

130.   Defendants intentionally violated Title II by deliberately failing to honor Ms. Chavez's preference for a qualified sign language interpreter.

131.   Defendants intentionally violated Title II by deliberately excluding

[3453717.11]

Ms. Chavez from or limiting her access to conversations regarding her own medical care by having these conversations with Ms. Farias instead of with Ms. Chavez, the patient.

132.   Defendants intentionally violated Title II by deliberately engaging in practices that "create[] the risk of violating [Ms. Chavez's] rights," according to the Statement of Deficiencies from the California Department of Public Health.  *See* **Exhibit A** at 2.

133.   Defendants, who on information and belief have an arrangement in which members of the faculty of the Keck School of Medicine of the University of Southern California medical school provide medical care as doctors at Defendant Hospital, intentionally violated Title II of the ADA by perpetuating and/or aiding, through contractual or other arrangements, the discrimination against Ms. Chavez at Defendant Hospital by failing to ensure these doctors had sufficient training to uphold Ms. Chavez's federally protected rights.

134.   In addition, Defendants intentionally violated Title II of the ADA by, either directly or through contractual or other arrangements with the Keck School of Medicine of the University of Southern California, utilizing criteria or methods of administration in the course or providing medical care to its patients that had the effect of subjecting Ms. Chavez to discrimination on the basis of disability by failing to ensure that she was afforded full and equal access to her own medical care.

135.   Defendants, who on information and belief have an arrangement in which members of the faculty of the Los Angeles County College of Nursing and Allied Health provide medical care as nurses at Defendant Hospital, intentionally violated Title II of the ADA by perpetuating and/or aiding, through contractual or other arrangements, the discrimination against Ms. Chavez at Defendant Hospital by failing to ensure these nurses had sufficient training to uphold Ms. Chavez's federally protected rights.

136.   In addition, Defendants intentionally violated Title II of the ADA by,

[3453717.11]

either directly or through contractual or other arrangements with the Los Angeles County College of Nursing and Allied Health, utilizing criteria or methods of administration in the course or providing medical care to its patients that had the effect of subjecting Ms. Chavez to discrimination on the basis of disability by failing to ensure that she was afforded full and equal access to her own medical care.

137.   Ms. Chavez continues to experience medical problems and needs to go to hospitals and clinics.  She lives in proximity to multiple hospitals and clinics that, on information and belief, are operated by Defendant DHS and by Defendant Los Angeles County.  She would like to receive care from Defendants but is deterred due to their discriminatory practices.

138.   Ms. Chavez continues to experience gastrointestinal problems and would like to go to Defendant Hospital to receive medical care, due to their knowledge of her medical history.  However, she is deterred from doing so due to their discriminatory practices.

139.   Defendants were and are in violation of Title II of the ADA, 42 U.S.C. § 12131, *et seq.*, and regulations promulgated thereunder.  Because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies.  Further, as a direct result of Defendants' conduct, Plaintiff Chavez continues to suffer irreparable harm, including being deterred from seeking medical care at Defendants' hospitals and clinics.  Unless the Court enjoins Defendants from continuing to engage in these unlawful practices, Plaintiff will continue to suffer irreparable harm.

140.   Additionally, as a direct result of Defendants' conduct, Plaintiff Chavez has suffered emotional harm including severe emotional distress, sleeplessness, recurring nightmares, and weight loss.

WHEREFORE, Plaintiff prays for relief as set forth below.

[3453717.11]

### SECOND CLAIM FOR RELIEF
### Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*
### (Against All Defendants)

141.   Plaintiff incorporates by this reference all preceding paragraphs as though fully set forth herein.

142.   Section 504 of the Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance …." 29 U.S.C. § 794(a).

143.   The term "disability" includes physical impairments that substantially limit one or more major life activities.  *See* 29 U.S.C. § 705(20)(B).

144.   Section 504 defines "program or activity," in relevant part, as "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government; or the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government … any part of which is extended Federal financial assistance."  29 U.S.C. § 794(b)(1).

145.   Regulations implementing Section 504 in provide that "[a] recipient to which this subpart applies … shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question."  45 C.F.R. § 84.52(d)(1).  Auxiliary aids and services include "interpreters."  *Id.* § 84.52(d)(3).

146.   Regulations implementing Section 504 further prohibit covered entities from "(2) Afford[ing] a qualified handicapped person an opportunity to receive benefits or services that is not equal to that offered non-handicapped persons; (3) Provid[ing] a qualified handicapped person with benefits or services that are not as effective (as defined in § 84.4(b)) as the benefits or services provided to others;

[3453717.11]

[and] (4) Provid[ing] benefits or services in a manner that limits or has the effect of limiting the participation of qualified handicapped persons." *Id.* § 84.52(a)(2)-(4).

147.    These regulations further require that "[a] recipient that provides notice concerning benefits or services or written material concerning waivers of rights or consent to treatment shall take such steps as are necessary to ensure that qualified handicapped persons, including those with impaired sensory or speaking skills, are not denied effective notice because of their handicap." *Id.* § 84.52(b).

148.    Federally funded programs and activities also may not, in providing aids, benefits, or services, aid or perpetuate discrimination against a qualified person with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the recipients program or activity. 45 C.F.R. § 84.4(b)(1)(v).

149.    Additionally, federally funded programs and activities may not, directly or through contractual or other arrangements, utilize criteria or methods of administration that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap; that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons; or that perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same State. 45 C.F.R. § 84.4(b)(4).

150.    On information and belief, Defendant LAC+USC Medical Center is an instrumentality of Los Angeles County, which receives federal financial assistance including Medicaid and Medicare reimbursements and grants for teaching and/or research.  Therefore, all of the operations of Defendant LAC+USC Medical Center are a program or activity receiving federal financial assistance, covered by 29 U.S.C. § 794.

151.    On information and belief, Defendant DHS is a department of Los

[3453717.11]

Angeles County, which receives federal financial assistance including Medicaid and Medicare reimbursements and grants for teaching and/or research.  In the alternative, on information and belief, Defendant DHS is a department of Los Angeles County that distributes federal financial assistance, including Medicaid and Medicare reimbursements and grants for teaching and/or research.  Therefore, all of the operations of Defendant DHS are a program or activity receiving federal financial assistance, covered by 29 U.S.C. § 794.

152.   On information and belief, Defendant County of Los Angeles receives federal financial assistance including federal funding for school, roads, healthcare, and federal prisoner reimbursements.  In the alternative, on information and belief, Defendant County of Los Angeles distributes federal financial assistance including federal funding for school, roads, healthcare, and federal prisoner reimbursements. Therefore, all of the operations of Defendant County of Los Angeles are a program or activity receiving federal financial assistance, covered by 29 U.S.C. § 794.

153.   At all times relevant to this complaint, and currently, Plaintiff Chavez has been deaf and substantially limited in the major activities of hearing and speaking.  Plaintiff Chavez is thus a qualified individual with a disability within the meaning of Section 504 of the Rehabilitation Act. 42 U.S.C. §§ 794, *et seq.*

154.   Defendants intentionally violated Section 504 of the Rehabilitation Act by failing to provide qualified sign language interpreters to ensure effective communication between Plaintiff Chavez and their personnel.

155.   Defendants intentionally violated Section 504 of the Rehabilitation Act by affording Ms. Chavez a right to participate in her own medical care that was not equal to the opportunity afforded others, providing Ms. Chavez with the benefit or service of communicating with her about her medical care that was not equal to the benefits and services provided to others, and providing the benefit or service of communication regarding her medical care in a manner that was not equal to the benefits and services provided to others by limiting Ms. Chavez's information to a

[3453717.11]

few hand-written words and a picture, while conveying full information to her mother, who was not the patient.

156.   Defendants intentionally violated Section 504 of the Rehabilitation Act by failing to take such steps as were necessary to ensure that Plaintiff Chavez received notice of her consent to treatment that was equal to the notice provided others, including a verbal explanation of the procedure she was about to undergo and an opportunity to ask questions.

157.   Defendants, who on information and belief have an arrangement in which members of the faculty of the Los Angeles County College of Nursing and Allied Health provide medical care as nurses at Defendant Hospital, intentionally violated Section 504 of the Rehabilitation Act by perpetuating and/or aiding, through contractual or other arrangements, the discrimination against Ms. Chavez at Defendant Hospital by failing to ensure these nurses had sufficient training to uphold Ms. Chavez's federally protected rights.

158.   In addition, Defendants intentionally violated Section 504 of the Rehabilitation Act by, either directly or through contractual or other arrangements with the Los Angeles County College of Nursing and Allied Health, utilizing criteria or methods of administration in the course or providing medical care to its patients that had the effect of subjecting Ms. Chavez to discrimination on the basis of disability by failing to ensure that she was afforded meaningful access to her own medical care.

159.   For the reasons set forth above, Plaintiff Chavez is likely to suffer future discrimination if Defendants are not enjoined from their discriminatory conduct.

160.   For the reasons set forth above, Plaintiff Chavez has suffered significant emotional distress resulting from Defendants' wrongful and discriminatory conduct.

WHEREFORE, Plaintiff prays for relief as set forth below.

[3453717.11]

**THIRD CLAIM FOR RELIEF**
**Section 1557 of the Patient Protection and Affordable Care Act**
**(Against All Defendants)**

161.   Plaintiff incorporates by this reference all preceding paragraphs as though fully set forth herein.

162.   Section 1557 of the Patient Protection and Affordable Care Act (the ACA) prohibits discrimination "on the ground prohibited under … section 794 of title 29 … under any "health programs or activity, any part of which is receiving Federal financial assistance." *See* 42 U.S.C. § 18116(a).

163.   Pursuant to the regulations implementing the ACA, "covered entity" means "[a]n entity that operates a health program or activity, any part of which receives Federal financial assistance." 45 C.F.R. § 92.4.

164.   Under these regulations, "health program or activity mean the provision or administration of health-related services, health-related insurance coverage, or other health-related coverage, and the provision of assistance to individuals in obtaining health-related services or health-related insurance coverage. For an entity principally engaged in providing or administering health services or health insurance coverage or other health coverage, all of its operations are considered part of the health program or activity, except as specifically set forth otherwise in this part. Such entities include a hospital …." *Id.*

165.   Under these regulations, "[a] covered entity shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in health programs and activities, in accordance with the standards found at 28 CFR 35.160 through 35.164. Where the regulatory provisions referenced in this section use the term 'public entity,' the term 'covered entity' shall apply in its place." 45 C.F.R. § 92.202(a).

166.   Further, under these regulations, recipients of federal financial assistance that operate a health program or activity must comply with certain regulations implementing Section 504 of the Rehabilitation Act, including 45 C.F.R.

[3453717.11]

§ 84.52(a)-(c).  *See* 45 C.F.R. § 92.101.

167.   On information and belief, all the operations of Defendant LAC+USC Medical Center and Defendant DHS are considered a "health program or activity" receiving federal financial assistance including Medicaid and Medicare reimbursements, and grants for teaching and/or research.  Therefore, Defendants are each subject to under 42 U.S.C. § 18116(a); 45 C.F.R. §§ 92.101, 92.202.

168.   On information and belief, Defendant Los Angeles County operates Defendants DHS and LAC+USC Medical Center, and is considered a "covered entity" subject to 42 U.S.C. § 18116(a); 45 C.F.R. §§ 92.101, 92.202.

169.   Under the ACA regulations, "Disability means, with respect to an individual, a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment, as defined and construed in the Rehabilitation Act, 29 U.S.C. 705(9)(B), which incorporates the definition of disability in the ADA, 42 U.S.C. 12102, as amended. Where this part cross-references regulatory provisions that use the term 'handicap,' 'handicap' means 'disability' as defined in this section.'"  45 C.F.R. § 92.4.

170.   Plaintiff Claudia Chavez is a qualified individual with a disability within the meaning of the ACA for the same reasons that she is a qualified individual with a disability under the ADA.  *See* 42 U.S.C. § 12102; 45 C.F.R. § 92.4.

171.   For the reasons set forth above, Defendants' conduct that intentionally violated Title II of the ADA and its implementing regulations likewise intentionally violated Section 1557 of the ACA and its implementing regulations.

172.   For the reasons set forth above, Plaintiff Chavez is likely to suffer future discrimination if Defendants are not enjoined from their discriminatory conduct.

173.   For the reasons set forth above, Plaintiff Chavez has suffered

[3453717.11]

significant emotional distress resulting from Defendants' wrongful and discriminatory conduct.

WHEREFORE, Plaintiff prays for relief as set forth below.

### FOURTH CLAIM FOR RELIEF
#### Cal. Gov. Code § 11135
#### (Against All Defendants)

174. Plaintiff incorporates by this reference all preceding paragraphs as though fully set forth herein.

175. California Government Code § 11135 and the regulations promulgated thereunder prohibit discrimination against persons with disabilities by any program or activity that receives financial assistance from the state.

176. On information and belief, Defendants Los Angeles County, DHS, and LAC+USC Medical Center each receive financial assistance from the State of California to support the program and activity of providing healthcare services.

177. Plaintiff Claudia Chavez is a person with a disability within the meaning of California Government Code § 11135.

178. By denying Ms. Chavez full and equal access to the program and activity of healthcare services at LAC+USC Medical Center, Defendants have denied Ms. Chavez the benefits of, or unlawfully subjected her to discrimination in, a program and activity of healthcare services solely because of her disability in violation of California Government Code § 11135 and the regulations promulgated thereunder.

179. Because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies. Further, as a direct result of Defendants' conduct, Plaintiff Chavez continues to suffer irreparable harm, including being deterred from seeking medical care at Defendants' hospitals and clinics. Unless the Court enjoins Defendants from continuing to engage in these unlawful practices, Plaintiff will continue to suffer irreparable harm.

WHEREFORE, Plaintiff prays for relief as set forth below.

[3453717.11]

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff Claudia Chavez seeks the relief as set forth below:

1.     An order and declaration that Defendants discriminated, and continue to discriminate, against Plaintiff by failing to afford her full and equal access to the services, facilities, privileges, and accommodations of Defendants' healthcare services, including those provided at LAC+USC Medical Center, on the basis of her disability in violation of Title II of the ADA, 42 U.S.C. § 12131, *et seq.*, Section 1557 of the ACA, 42 U.S.C. § 18116, Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794, *et seq.*, and California Government Code §§ 11135, *et seq*.

2.     A permanent injunction pursuant to Title II of the ADA, 42 U.S.C. § 12133, Section 1557 of the ACA, 42 U.S.C. § 18116, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794a, and California Government Code § 11135, requiring Defendants to take the steps necessary to ensure that all healthcare services and activities, are accessible to Plaintiff;

3.     Award Plaintiff Chavez compensatory damages in an amount to be determined by proof pursuant to Title II of the ADA, 42 U.S.C. §§ 12133, *et seq.*, Section 1557 of the ACA, 42 U.S.C. § 18116, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq.*;

4.     Award Plaintiff Chavez her reasonable attorneys' fees, as authorized by Title II of the ADA, 42 U.S.C. §§ 12205, *et seq.*, Section 1557 of the ACA, 42 U.S.C. § 18116, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794a, *et seq.*, California Code of Civil Procedure § 1021.5, and other applicable law;

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

[3453717.11]

1    5.    Such other and further relief as this Court may deem just and proper.

2

3    DATED:  December 18, 2019        Respectfully submitted,

4                                    ROSEN BIEN GALVAN & GRUNFELD LLP

5
                                     By:  */s/ Lisa Ells*
6                                         Lisa Ells

7
                                     Attorneys for Plaintiff
8

9

10                              **JURY DEMAND**

11        Plaintiffs respectfully request a jury trial on all issues so triable.

12

13   DATED:  December 18, 2019        Respectfully submitted,

14                                    ROSEN BIEN GALVAN & GRUNFELD LLP

15
                                     By:  */s/ Lisa Ells*
16                                        Lisa Ells

17
                                     Attorneys for Plaintiff
18

19

20

21

22

23

24

25

26

27

28

30